IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILBERT FUNERAL SERVICES, INC. )
                                              )
        **Plaintiff,**                 )
                                                )
                                                )           **Case No. 09 C 5694**
        **vs.**                      )
                                                )           **Judge Joan H. Lefkow**
                                                  )
**WILBERT of BIRMINGHAM, LLC**    )
                                                )
        **Defendants.**             )

## OPINION AND ORDER

Wilbert of Birmingham, LLC ("WOB") originally filed an action against Wilbert Funeral

Services, Inc. ("Wilbert") in the United States District Court for the Northern District of

Alabama, alleging that Wilbert improperly terminated the parties' licensing agreement, which

granted WOB the right to use Wilbert's intellectual property. Pursuant to a forum-selection

clause in the licensing agreement, Wilbert filed a motion to transfer venue to the Northern

District of Illinois and, as a result, WOB voluntarily dismissed the action. Subsequently, Wilbert

filed a motion in this court to compel arbitration of the dispute and to request a temporary

restraining order and a preliminary injunction against WOB. Wilbert seeks injunctive relief to

prevent WOB from continuing to manufacture, distribute, service, market, and sell products

using Wilbert's intellectual property. WOB responded by filing its own motion for a temporary

restraining order and a preliminary injunction, requesting that the court prevent Wilbert from

impairing WOB's use of Wilbert's intellectual property. WOB agreed with Wilbert that the

merits of the dispute should be resolved in arbitration. On October 9, 2009, this court held a

1

hearing on the parties' cross motions for injunctive relief.   Based on the evidence presented at

the hearing and the parties' written submissions, the court denies Wilbert's motion [#5] and

grants WOB's motion [#12].

**RELEVANT FACTS**

Wilbert is an Illinois corporation that supplies components such as molds, adhesives, and

vault liners that are used in the process of burial vault manufacturing to a national network of

licensees.  WOB is an Alabama corporation and one such licensee.  WOB's relationship with

Wilbert is governed by an Intellectual Property and License Agreement ("the Agreement"),

which authorizes WOB to use Wilbert's intellectual property until August 31, 2015, provided

that WOB adheres to the terms of the Agreement.  *See* Joint Ex. 1.  Paragraph 6(a) of the

Agreement grants Wilbert the right to set manufacturing standards and quality control measures

to be implemented in conjunction with WOB's use of Wilbert's intellectual property.  *Id.*

Paragraph 11 specifically requires that WOB abide by these standards.  *Id.*

Paragraph 16(d) of the Agreement provides that Wilbert may terminate the Agreement

"[t]hirty (30) days after written notice . . . upon the violation of, or failure to satisfy, the

obligations of any other provision of this Agreement, unless cured within such 30-day period."

*Id.*  It further states that

> "[u]pon an Event of Default, this Agreement shall terminate without further
> notice to [WOB] effective immediately upon the expiration of the notice period if
> any . . . provided, however, that [WOB] will have no right to cure a default when
> other defaults of a similar nature in the same location (as to which written notice
> has been given by [Wilbert]) have occurred . . . at least three (3) times within the
> prior twenty-four (24) months and which individually or in the aggregate are
> material."

> *Id.*

The parties' dispute centers around the applicability of Paragraph 16(d) to the facts of the instant case. They agree that the paragraph allows Wilbert to terminate the Agreement in the event of three material defaults within a two-year period and further agree that WOB was found to be in default twice in 2009, once in January and once in February. They disagree, however, as to whether WOB was found to be in default a third time on May 19, 2009, and as to whether any of the defaults was material. They further disagree as to the procedure required by Paragraph 16(d) for a valid termination.

## I.      First and Second Defaults

On January 20, 2009, Bobby Morgan ("Morgan"), a field representative for Wilbert, conducted a compliance inspection of WOB's facilities, which, according to Morgan, revealed four material default issues that WOB needed to address. After his inspection, Morgan spoke with Marvin Lands ("Lands"), WOB's co-owner, about the alleged default issues. Lands testified that he did not agree with Morgan's characterization of the issues as default issues, but that he did not articulate his disagreement because he "never argued with [Morgan] about anything" and because if "[Lands] question[s] [Morgan's] judgment, he will – he will argue with [Lands] very hard and very angry." Deposition of Marvin Lands, 27:5-6, 28:5-7, Oct. 15, 2006 (hereinafter "Lands Dep."). Nevertheless, Lands testified that he believed Morgan's inspection was faulty. *Id.* 26:13-27:6. Specifically, he testified that Morgan inspected products at WOB's manufacturing facility instead of its storage facility, and as a result, that Morgan inspected unfinished products that WOB would never have sent to its customers. *Id.* 26:13-21. According to Lands, WOB manufactures products in one location (the manufacturing facility) and then transports finished products to another location (the storage facility), where WOB checks the

3

products for quality and discards defective products. *Id.* 22:16-23:21. Lands testified that the faulty products giving rise to Morgan's default findings would not have passed WOB's own inspection and therefore would have been discarded before the shipping process began. *Id.* 29:10-30:5.

After his visit, Morgan drafted a report that detailed his findings, indicated that WOB was not in compliance with Wilbert's manufacturing standards, and identified the four default issues that WOB needed to address. On January 28, 2009, Wilbert sent WOB a letter titled "License Agreement 1st Default," along with a copy of Morgan's report and an official notice of default. The letter stated that Morgan's inspection "revealed numerous violations and evidence of non-compliance." Joint Ex. 2B. The notice stated that WOB was, at the time of the January 20, 2009 inspection, "in default under [the Agreement] between [WOB] and Wilbert" and identified specific terms of the Agreement that WOB allegedly violated. *Id.*

On February 25, 2009, Morgan conducted a second compliance inspection of WOB's facilities, which, according to Morgan, again revealed four material default issues that WOB needed to address. Lands again disagrees that these issues were material defaults, if defaults at all. Indeed, he testified that, as in January, Morgan inspected products at WOB's manufacturing facility instead of its storage facility. Lands Dep. 38:11-39:1, 47:15-19. He further testified that Morgan's inspection of unfinished products was a recurring problem. *Id.* 47:15-22.

After Morgan's February visit, he again drafted a report that detailed his findings, indicated that WOB was not in compliance with Wilbert's manufacturing standards, and identified four "default issues" that WOB needed to address. On March 3, 2009, Wilbert sent WOB a letter titled "License Agreement 2nd Default," along with a copy of Morgan's report and

an official notice of default. The letter stated that Morgan's inspection again "revealed numerous violations and evidence of non-compliance," reminded WOB that it was "still operating [its] facility in a severe default condition from [its] January 22, 2009 inspection" and further stated that WOB's "licensee agreement [would] be terminated if violations [were] not corrected by March 26, 2009." Joint Ex. 3B. The notice stated that WOB was, at the time of the February 25, 2009 inspection, "in default under [the Agreement] between [WOB] and Wilbert," and identified specific terms of the Agreement that WOB allegedly violated. *Id.*

On March 27, 2009, Morgan, in addition to the President of Wilbert, the Vice President of Operations for Wilbert, and the Executive Vice President of Wilbert, conducted a third compliance inspection of WOB's facilities. Morgan's report from this inspection, which Wilbert sent to WOB, revealed that WOB had cured the defaults that existed in January and February. Joint Ex. 4. It also stated that WOB was "on a Two (2) year probationary period from [the March 27, 2009] visit" and that "failure to follow through, and maintain the progress of improvement will result in [WOB's] license being TERMINATED." *Id.*

## II. May 19, 2009 Visit

Morgan again visited WOB's facilities on May 19, 2009. The parties disagree, however, as to whether Morgan performed a compliance inspection on this date. Wilbert argues that Morgan performed a compliance inspection and that the inspection revealed several default issues, all of which were material. WOB argues that Morgan only made a casual visit, that he did not perform an inspection, and that he did not identify any issues that could constitute a default, let alone a material default.

At the hearing, Morgan testified that he went to WOB on May 19, 2009 intending to pay

a casual visit. Tr. 40:14-17. He testified that when he arrived at the WOB facility, he was able

to see that WOB had fallen out of compliance with Wilbert standards and that, as a result, he

decided to conduct an informal compliance inspection. *Id.* 40:18-25. He further testified that he

found cracked Wilbert liners and other finished Wilbert products that were not up to Wilbert's

standards. *Id.* 41:12-42:3. He also testified that he saw finished Wilbert burial vaults stored

outside of WOB's warehouse, even though Wilbert does not allow outdoor storage of its

products. *Id.* 42:5-9. Morgan characterized each of these issues as putting WOB in material

default of the agreement. *Id.* 42:13-21. Morgan presented photographs of these alleged default

issues during the hearing and testified that they depicted the default issues as he described them.

After Lands examined the photographs, however, he testified that they did not actually depict

default issues. Specifically, he testified that a picture that Morgan described as depicting

finished Wilbert product did not actually depict finished product. Lands Dep. 71:15-72:1.

The dispute regarding the pictures notwithstanding, WOB admits that Lands knew that

WOB had cracked liners at its facility on May 19, 2009. WOB alleges, however, that Wilbert

shipped the liners in a defective condition, thus excusing this alleged violation. WOB further

claims that Morgan found these liners at WOB's manufacturing facility. Indeed, Lands testified

that Morgan observed some of the liners crack during a step in the manufacturing process. *Id.*

57:14-58:16. Lands further testified that he sent the majority of the cracked liners back to

Wilbert in June, and that Wilbert accepted the liners back without protest. *Id.* 68:6-69:7. At the

hearing, Morgan admitted that he was unable to tell how the liners became cracked and admitted

that each of the liners was cracked in the same location, indicating that Wilbert's entire shipment

may have been defective.  Tr. 45:5-6, 51:4-7.  He also admitted that he was aware that Wilbert

had shipped defective liners to other licensees in April and May of 2009.  *Id.* 46:3-8.

WOB futher argues that even if the liners were cracked due to WOB's negligence, such

negligence would not be sufficient to put WOB in material default of the Agreement.  Morgan

testified that in 2008, he conducted a compliance inspection on a Wilbert licensee in Florence,

South Carolina, during which he also found cracked liners.  *Id.* 52:8-19.  He testified that he

could not be sure as to whether he put the Florence licensee in default without having his report

in front of him, but that it was possible that he did not put the Florence licensee in default,

despite the fact that it had cracked Wilbert liners at its facility.  *Id.* 53:24-54:2.

### III.    Communication Between Wilbert and WOB After May 19, 2009

Despite their disagreement as to what took place on May 19, 2009, the parties agree that

Wilbert never sent WOB a notice of default in connection with Morgan's May visit.  The parties

further agree that the next communication sent from Wilbert to WOB was a letter dated

August 24, 2009, in which Wilbert stated that WOB was "still in violation of [its] 24 month

probationary period per [the] Plant Inspection Report dated March 27, 2009."  Joint Ex. 5.

Attached to the letter was an Issue Resolution Statement dated April 3, 2009, which indicated

that WOB was in a "compliant position" and that it was on a two-year probationary period "at

which time a [Wilbert] Field Service Engineer, or other [Wilbert] management staff, is subject to

appear at [WOB's] facility unannounced, for the purpose of future reviews, pertaining to

production and service compliance and that failure to follow through and maintain the progress

of improvement will result in [WOB's] license being TERMINATED.  [WOB] will not be given

30 days to correct any future default corrections on any future [Wilbert] field visits."  *Id.*

The next communication from Wilbert was an email dated September 9, 2009, which was addressed to WOB co-owner Lisa Turner ("Turner") and which notified Turner that Wilbert was terminating the Agreement, effective immediately. Turner testified that after she received the email, she considered the possibility of entering into an agreement with another concrete burial vault manufacturer. Deposition of Lisa Turner, 7:23-8:1, Oct. 16, 2009 (hereinafter "Turner Dep."). In addition to Wilbert, there are three major concrete burial vault manufacturing operations in the industry, Doric, Eagle, and Trigard. Doric and Eagle, like Wilbert, operate using exclusive licensees in various territories across the country. Turner testified that it was "common knowledge" that Doric and Eagle already had licensees operating in Birmingham (where WOB conducts the majority of its business), that she personally knew those licensees, and that she therefore did not call either company to inquire about becoming a licensee. *Id.* 105:18-106:12. She further testified that although Trigard does not use an exclusive licensing system, she knew that Trigard already had a dealer in Birmingham. *Id.* 102:17-22. She had an employee call Trigard to "verify what [she] thought was true" and she testified that the employee was told that Trigard already had a dealer in Birmingham and was not willing to set up another dealer in close geographic proximity. *Id.* 102:23-103:4. After speaking with her employee, she concluded that it was not possible for WOB to enter into an alternative agreement.

Turner further testified that even if WOB could enter into an alternative arrangement, such an arrangement would be detrimental to WOB's customer base. Despite her assertion that WOB has "very good customer relationships," Turner estimated that if WOB were to use a brand other than the Wilbert brand, WOB could probably only retain fifty percent of its customer base. *Id.* 13:22-23. She explained that "Wilbert makes the best vault, and it's the top brand, and some

8

of [WOB's] customers are strictly Wilbert customers." *Id.* 14:1-3. In addition to customer

retention issues, Turner testified that an alternative arrangement would create fatal financial

issues for WOB. She testified that WOB would have to replace a large amount of equipment and

marketing products that belong to Wilbert or bear the Wilbert name. Turner testified that the

costs associated with this replacement would be in excess of $250,000, and that because WOB is

currently in debt of nearly $1 million, WOB would not be able to afford these costs. *Id.* 8:21-

13:14. According to Turner, because WOB cannot secure an alternative supplier and cannot

afford the cost of doing so even if it could, WOB will survive "a month at the outside" if WOB is

not allowed to continue using Wilbert products. *Id.* 5:10. Indeed, she testified that, after a

month, WOB will have to declare bankruptcy. *Id.* 5:12.

On or about September 17, 2009, WOB ordered products from Wilbert, but Wilbert

refused to supply WOB with any such products. At the evidentiary hearing on October 9, 2009,

the court ordered Wilbert to supply WOB with the products it requested, pending resolution of

the parties' cross motions for injunctive relief. Thereafter, the parties reached an agreement that

required other Wilbert franchisees to supply WOB with finished Wilbert products during the

interim period.

## ANALYSIS

**I.      Standard for Injunctive Relief**

A party seeking a preliminary injunction or a temporary restraining order must

demonstrate that (1) absent injunctive relief, it will suffer irreparable harm in the period prior to

final resolution of its claim; (2) traditional legal remedies would be inadequate; and (3) its claim

has some likelihood of success on the merits. *Girl Scouts of Manitou Council* v. *Girl Scouts of*

*the United States of America, Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008). If the moving party

satisfies these threshold requirements, the court must balance the threatened injury to the moving

party with the threatened harm the injunction may inflict on the nonmovant. *Id.* The court also

must consider the public interest in either the grant or denial of the injunctive relief. *Id.*

## II.      Wilbert's Motion

Wilbert argues that it is entitled to injunctive relief that would prohibit WOB from using

Wilbert's intellectual property because WOB no longer has the right to use the property. Wilbert

asserts that "without question," WOB's use of Wilbert's intellectual property after September 9,

2009 "constitutes intentional [trademark] infringement" that gives rise to irreparable harm. Pl.'s

Mot. at 13. To support its argument, Wilbert relies on several cases that characterize the harm

resulting from trademark infringement as inherently irreparable. *See, e.g.*, *Re/Max N. Cent.,*

*Inc.* v. *Cook*, 272 F.3d 424, 432 (7th Cir. 2001) ("[D]amage to a trademark holder's goodwill can

constitute irreparable injury for which the trademark owner has no adequate legal remedy.");

*Wesley-Jensen Div. of Schering Corp.* v. *Baush & Lomb, Inc.*, 698 F.2d 862, 867 (7th Cir. 1983)

("[Defendants'] loss of control over its reputation justifies a finding of irreparable harm even if it

could demonstrate no loss of sales or market share."); *Processed Plastics Co.* v. *Warner*

*Commc'ns*, 675 F.2d 852, 858 (7th Cir. 1982) ("[D]amages occasioned by trademark

infringement are by their very nature irreparable . . . ."). Wilbert also relies heavily on

*Gorenstein Enters. Inc.* v. *Quality-Care USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989), which, it

argues, stands for the proposition that "[o]nce a franchise has been terminated, the franchisee

cannot be allowed to keep on using the trademark" and explains that "[i]f the owner of the

trademark has broken off business relations with a licensee he cannot ensure the continued

10

quality of the (ex-)licensee's operation, whose continued use of the trademark is therefore a violation of trademark law." In sum, Wilbert argues that WOB's continued use of Wilbert's intellectual property will cause irreparable harm because Wilbert will not be able to control the quality of the product that WOB will produce but that will bear the Wilbert name.

Wilbert's reliance on these trademark cases is not helpful first because this case does not involve a trademark infringement claim and second because this case is distinguishable from each of the cases Wilbert relies on. In *Re/Max* and *Gorenstein*, the only cases Wilbert cites involving a franchise relationship and having somewhat similar facts to the case at bar, it was clear that the franchisor properly terminated the franchise agreement and that the franchisee nevertheless continued to use the franchisor's marks. *See Re/Max N. Cent., Inc.*, 272 F.3d 432; *Gorenstein*, 874 F.2d at 435. To the contrary, in the instant case, it is not at all clear that Wilbert validly terminated the Agreement. In fact, the entire dispute centers around the validity of Wilbert's purported termination. Further, as explained below, WOB has presented enough evidence to demonstrate at least some likelihood of success on its claim that Wilbert did not validly terminate the Agreement. To accept Wilbert's argument and recognize that Wilbert would suffer the harms associated with trademark infringement without injunctive relief would effectively require the court to make a preliminary finding that Wilbert had the right to terminate the Agreement. This is precisely the issue to be decided by the arbitrator, not by this court.

Accordingly, Wilbert has failed to establish that it would suffer irreparable harm in the absence of injunctive relief. As such, Wilbert cannot meet the threshold requirements for injunctive relief, and the court denies Wilbert's motion for a temporary restraining order and a preliminary injunction.

**III.     WOB's Motion**

WOB argues that it is entitled to injunctive relief that would prevent Wilbert from impairing WOB's use of Wilbert's intellectual property, effectively requesting that the court order Wilbert to continue to supply its products to WOB.

**A.     Irreparable Harm/Inadequate Legal Remedy**

To show lack of an adequate remedy at law, the moving party must show that monetary damages would be "seriously deficient as a remedy for the harm suffered." *Roland Mach. Co.* v. *Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). "A damages remedy may be inadequate if it comes 'too late to save the plaintiff's business or if the nature of the plaintiff's loss may make damages very difficult to calculate.'" *Gateway E. Ry. Co.* v. *Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (quoting *Roland Mach. Co.*, 749 F.2d at 386). The same principle applies in the context of irreparable harm; indeed, a business is said to suffer irreparable harm if it is forced to shut down while awaiting trial. *Roland Mach. Co.*, 749 F.2d at 386; *see also United Air Lines, Inc.* v. *Air Line Pilots Ass'n*, No. 08-cv-4317, 2008 WL 4936847, at * 45 (N.D. Ill. Nov. 17, 2008) ("The question whether the plaintiff has an adequate remedy at law is closely tied to whether the plaintiff will suffer irreparable injury if an injunction is not issued . . . . The rationale of both requirements is that if a damage award can fully compensate the plaintiff for any injury suffered, the court should defer any remedy until a full trial on the merits has been conducted." (citations omitted)).

Furthermore, in the narrow context where a licensor/franchisor and licensee/franchisee dispute the applicability of an agreement between them, a few courts have granted the licensee injunctive relief to allow it to continue to use the licensor's trademark pending the outcome of

12

litigation or arbitration where the licensee would otherwise be forced out of business. *See, e.g.*,

*Ferguson-Kubly Indus. Servs., Inc.* v. *Circle Envtl., Inc.*, 409 F. Supp. 2d 1072, 1079 (E.D. Wis.

2005) (preliminary injunction granted in favor of franchisee to prohibit franchisor from

terminating franchise agreement where franchisee would suffer irreparable harm in the forms of

damage to its business reputation and loss of 60% of its business); *Janmort Leasing, Inc.* v.

*Econo-Car Int'l, Inc.*, 475 F. Supp. 1282, 1294-95 (E.D.N.Y. 1979) (franchisee was entitled to

preliminary injunction prohibiting franchisor from terminating franchise agreement and

requiring franchisor to fulfill its obligations under franchise agreement pending arbitration where

franchisee would otherwise be "reduced to a point where [it] [would] have virtually no ability to

continue in business.").

WOB argues that in the absence of injunctive relief, it will suffer irreparable harm for

which there exists no adequate legal remedy because WOB will suffer damage to its business

reputation as a Wilbert licensee and because WOB cannot remain in business if it cannot use

Wilbert's intellectual property. WOB relies on Turner's testimony that WOB cannot secure an

alternative supplier of products necessary to continue manufacturing burial vaults and that even

if it could, it would lose half of its customer base and would not be able to afford the

accompanying financial costs. Turner Dep. 102:17-103:4, 105:18-105:12, 8:21-14:3. It further

relies on her testimony that in light of these challenges, WOB will not survive for more than a

month if it is not able to use Wilbert products. *Id.* 5:10-12. Indeed, Turner testified that after a

month, WOB would have to declare bankruptcy. *Id.* 5:12.

Significantly, Wilbert has produced no evidence to the contrary and even conceded at

oral argument that WOB would go out of business if it is not allowed to use Wilbert products. In

light of Turner's testimony and Wilbert's failure to produce evidence to rebut her assertions, the court finds that WOB has adduced sufficient evidence to demonstrate that if it is not allowed to use Wilbert products and marks pending resolution of the case, it will not be able to remain in business. As such, WOB has met its burden to demonstrate irreparable harm for which no adequate legal remedy exists. *See Roland Mach. Co.*, 749 F.2d at 386; *Ferguson-Kubly Indus. Servs, Inc.*, 409 F. Supp. 2d at 1079.

### B. Likelihood of Success on the Merits

To prevail on its motion for injunctive relief, WOB must also show some likelihood of success on the merits. This is a low threshold, as WOB need only demonstrate that its chances of prevailing are "better than negligible." *Roland Mach. Co.*, 749 F.2d at 387 (quoting *Omega Satellite Prods Co.* v. *City of Indianapolis*, 694 F.2d 119, 123 (7th Cir. 1982)).

WOB argues that it is likely to succeed on the merits because it is clear that Wilbert did not have proper grounds to terminate the Agreement. WOB first argues that the defaults in January and February and the alleged default in May were not material, if they existed at all, because Morgan did not inspect the proper products at WOB's facility. WOB relies on Lands' testimony that Morgan conducted his inspections at the manufacturing facility, and as a result, inspected products that WOB itself did not have time to inspect and would have eventually discarded. *See* Lands Dep. 29:10-30:5, 47:15-19. Because Morgan's default findings were based on unfinished product, WOB argues, none of them is legitimate.

WOB next argues that Morgan's May 19, 2009 visit did not constitute a compliance inspection within the meaning of the Agreement but rather a courtesy visit that could not and did not give rise to a valid finding of default. WOB notes that Morgan did not produce a report after

his visit, even though he had done so after each of the compliance inspections that he previously

conducted.  At the hearing, Morgan explained that he did not produce a report because his May

19, 2009 visit was "not a plant inspection." Tr. 56:9.  While this does explain the lack of a

report, WOB argues, it also provides clear evidence that Morgan did not actually perform a

compliance inspection when he visited WOB in May.  Finally, WOB notes that Wilbert did not

characterize the May 19, 2009 visit as an inspection until three months later, when it sent WOB a

letter on August 24, 2009.

WOB's next argument focuses on the content of the August 24, 2009 letter.  WOB points

out that unlike the letters that Wilbert sent WOB in January and February after WOB was found

to be in default, the August 24, 2009 letter did not identify any specific default issues or specific

violations that had been committed by WOB.  It further points out that unlike the previous letters

communicating to WOB that it was in default, a notice of default was not attached to the August

24, 2009 letter.  In fact, Wilbert never sent WOB a notice of default in connection with Morgan's

May 19, 2009 visit.

Finally, separate from the lack of substantive grounds for termination, WOB argues that

Wilbert's act of termination, the sending of the September 9, 2009 email, did not comply with

the contractually specified procedure for termination.  Paragraph 16(d) of the Agreement

requires that Wilbert give WOB 30 days notice prior to termination.  WOB notes that no such

notice was given, and therefore argues that Wilbert's act of termination was not valid.

WOB's arguments and proffered evidence are sufficient to establish a "better than

negligible" chance of success on the merits.  *See Roland Mach. Co.*, 749 F.3d at 387.  First, if

Lands' testimony is credited, it is possible that none of the findings of default were material, if

15

valid at all, and accordingly, that Wilbert had no right to terminate the agreement. Second, Wilbert's failure to follow its own established procedure for handling default issues and failure to produce a notice of default raise suspicions as to the nature of Morgan's May 19, 2009 visit and cast doubt on the propriety of Wilbert's termination of the Agreement. The inconsistencies in Wilbert's behavior could very well be evidence that Morgan's May visit was not actually an official inspection during which time Morgan encountered default issues. Third, it is clear that Wilbert failed to provide WOB with the notice required by Paragraph 16(d) of the Agreement. Accordingly, WOB has demonstrated at least some likelihood of success on the merits and has satisfied the threshold requirements for injunctive relief.

### C.     Balance of Harms and Public Interest

Once a moving party has satisfied the threshold requirements for injunctive relief, a court must balance the threatened injury to the moving party with the threatened harm that the injunction may inflict on the nonmovant. *Girl Scouts of Manitou Council*, 549 F.3d at 1085. In balancing the harm that would be caused to WOB if an injunction were not issued in favor of WOB and the harm to Wilbert if an injunction were issued in favor of WOB, the court finds that the harm to WOB outweighs the harm to Wilbert. Indeed, as explained above, if an injunction is not issued in favor of WOB, WOB will not survive. Wilbert, on the other hand, is not in such immediate and serious danger. The court acknowledges the possibility that WOB could be impermissibly using Wilbert's trademark; it still finds, however, that a temporary infringement of that nature is less damaging than a total shut down of a business.

Although at a hearing on October 26, 2009, Wilbert suggested that the parties abide by their temporary arrangement, in which other Wilbert franchisees supply WOB with finished

Wilbert products, the court finds that this solution does not adequately address the more severe

harm that WOB would suffer absent an injunction. Wilbert argued that this solution would

alleviate its concerns regarding the quality of WOB's products and would alleviate WOB's

concerns, as it would allow WOB to sell Wilbert products. WOB objected to the proposal,

arguing that the temporary arrangement is not sustainable because it has already forced WOB to

lay off several employees and because it would still result in fatal financial loss to WOB. The

court agrees with WOB that the possibility of WOB shutting down is still too likely under

Wilbert's proposed solution, and again notes that the harms associated with a total shut down of

a business outweigh the harms associated with a temporary trademark infringement.

The closing of WOB is not only inherently damaging, but also will have a significant

impact on the remainder of this dispute. Indeed, if WOB does not survive, the arbitration of the

parties' substantive claims will be rendered meaningless for WOB, as WOB will have nothing

left to defend. Where, as here, the meaningfulness of an arbitration proceeding depends upon the

granting or denying of injunctive relief, pro-arbitration policies weigh in favor of granting such

relief. *See Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Salvano*, 999 F.2d 211, 214 (7th Cir.

1993) ("[P]ro-arbitration policies . . . are furthered, not weakened, by a rule permitting a district

court to preserve the meaningfulness of arbitration by granting injunctive relief." (internal

quotation marks omitted)); *Sauer-Getriebe KG* v. *White Hydraulics, Inc.*, 715 F.2d 348, 351 (7th

Cir. 1983) (reversing district court's denial of a preliminary injunction because "[the plaintiff's]

right to arbitration will not be worth much if [the defendant] transfers [the plaintiff's alleged]

[contract] rights [to another territory] before arbitration is settled"). The court wishes to respect

the parties' policy choice to use arbitration, and notes that in doing so, the court is also furthering

the public interest in the continuing validity of arbitration proceedings.  *See Chi. Sch. Reform Bd.*

*of Trustees* v. *Diversified Pharmaceutical Servs, Inc.*, 40 F. Supp. 2d 987, 996 (N.D. Ill. 1999)

("[T]he public interest generally favors arbitration . . . . [where] the subject of the arbitration is

one that the parties actually agreed to arbitrate.").

Accordingly, the court finds that granting an injunction in favor of WOB would further

the public interest and further finds that WOB would suffer more harm in the absence of an

injunction than Wilbert would suffer in the presence of an injunction, as WOB would be forced

out of business and would be left with no remedy in the instant dispute.

## CONCLUSION

For the reasons discussed above, Wilbert's motion for a temporary restraining order and a

preliminary injunction [#5] is denied, and WOB's motion for a temporary restraining order and a

preliminary injunction [#12] is granted.  Wilbert is enjoined from preventing WOB from using

Wilbert's intellectual property and is ordered to supply WOB with the products it would

ordinarily supply under the parties' agreement.


Dated: October 29, 2009                    Enter: _____
                                                   JOAN HUMPHREY LEFKOW
                                                   United States District Judge